Lisa Bivens - S.B.N 034075
Don Bivens – S.B.N 005134
**DON BIVENS, PLLC**
Scottsdale Quarter
15169 N. Scottsdale Road, Suite 205
Scottsdale, Arizona 85254
Telephone: (602) 762-2661
lisa@donbivens.com
don@donbivens.com

Patrick J. Solberg (*pro hac vice forthcoming*)
**ANDERSON & WANCA**
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: (847) 368-1500
psolberg@andersonwanca.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Sarah Gray and Jennifer Dufault, individually and as representatives of a class of similarly-situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>Phoenix Children's Hospital, Inc., an Arizona nonprofit pediatric healthcare system,<br><br>Defendant. | No.<br><br>**CLASS ACTION COMPLAINT** |

## CLASS ACTION COMPLAINT

Plaintiffs Sarah Gray ("Gray") and Jennifer Dufault ("Dufault") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, through their attorneys, allege the following against Defendant Phoenix Children's Hospital, Inc. ("PCH" or "Defendant"):

## NATURE OF THE ACTION

1. This case challenges Phoenix Children's Hospital, Inc.'s ("PCH") unauthorized disclosure of patients' sensitive health-related communications through tracking technologies embedded on its website.

2. PCH is an Arizona nonprofit pediatric healthcare provider. As part of its business operations, PCH offers a public-facing website through which patients, parents, guardians, and prospective patients can perform a range of activities, including: searching for doctors, medical centers, medical conditions, and other medical services; scheduling appointments; and making payments. In other words, users communicate their private and personal information via the site, including protected health information ("PHI") and individually identifiable health information ("IIHI") (collectively referred to herein as "Private Information").

3. While engaging PCH through its website, Plaintiffs were assured by PCH that their private medical information was not being shared with third parties. PCH's privacy policy specifically states: "At no time is your private information, which is obtained through cookies, shared with third parties who have no right to that information."[1]

4. PCH's assurances were not true. PCH utilizes Google Analytics on its website. Google Analytics is a tool that allows website owners to track and document activity on their websites. Google Analytics immediately intercepts and shares with Google patients' interactions with the website, including what pages they view, what information they input,

[1] http://www.phoenixchildrens.org/our-policies (last visited October 6, 2026).

and what resources they search for, helping website owners improve their web pages and marketing.

5. To enable Google Analytics, PCH installed small pieces of code from Google on its website pages. When patients interact with PCH's website, these codes become embedded on their web browsers and send user activity data to Google in real time.

6. Specifically, PCH discloses to Google the details of patients' or other users'[2] private searches for healthcare providers, medical treatments, and specialty care as well as whether patients used the website to pay a bill, request an appointment, or submit a callback form. This information—taken together with other personally-identifying patient information taken from user web browsers—can be used to reasonably identify individual patients and their health needs and status.

7. PCH's disclosure of Plaintiffs' Private Information contravenes the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). As part of HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information," which governs how health care providers must safeguard and protect Private Information.

8. Under HIPAA, covered entities such as PCH are ***not*** permitted to use tracking technology tools, such as Google Analytics, in a way that exposes patients' Private Information to any third party without express and informed consent from the patient or patient's legal guardian. Indeed, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "Bulletin"), that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

---

[2] Since PCH is a children's hospital, many interactions with its website will be conducted by parents or guardians of the children receiving care. For this complaint, patients refer to both the children receiving care and their parents/guardians acting on their behalf.

> **Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[3]

9. By disclosing Plaintiffs' Personal Information in this manner, PCH has violated the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511, and the Arizona Consumer Fraud Act, A.R.S. § 44-1522.

10. Plaintiffs bring this Complaint seeking an order (i) declaring that PCH's conduct violates their rights under the ECPA; (ii) declaring that PCH's conduct violates Arizona's Consumer Fraud Act; (iii) awarding Plaintiffs and the proposed Class Members statutory damages in an amount prescribed by statute or an amount equal to actual damages/profits, whichever is greater; (iv) an award of punitive damages, if warranted; (v) enjoining PCH from intercepting, disclosing, or using Plaintiffs' and Class Members' health-related website communications through Google Analytics or other related tracking technologies without valid consent; (vi) requiring PCH to delete, retrieve, or request deletion of unlawfully disclosed information to the extent feasible; and (vii) awarding reasonable attorneys' fees, court costs, and other expenses associated with this action where permitted by law.

## PARTIES

11. Plaintiff Sarah Gray is a citizen of the State of Arizona residing in Phoenix, Arizona. Within the past year, Gray created an account for PCH's website and used the

---

[3] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, available at https://www.hhs.gov/hipaa/for-professronals/privacy/guidance/hipaa-online-tracking/index. html (last visited October 6, 2026) (emphasis in original).

website and the PCH App to search for doctors and schedule appointments for her minor son.

12. Plaintiff Jennifer Dufault is a citizen of the State of Arizona residing in Phoenix, Arizona. Within the past year, Dufault used PCH's website to find doctors for her minor son and access paperwork regarding her son's ER visits and surgery.

13. Defendant PCH is an Arizona nonprofit pediatric healthcare system headquartered in Phoenix, Arizona. PCH operates a flagship children's hospital, located in Phoenix, Arizona, as well as specialty, urgent care, and outpatient clinics across Arizona, providing comprehensive inpatient and ambulatory pediatric services.

14. PCH owns and operates its own website at phoenixchildrens.org.

15. PCH is a covered entity under HIPAA. 45 C.F.R. § 160.103.

## JURISDICTION AND VENUE

16. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the ECPA, 18 U.S.C. § 2511.

17. The Court has supplemental jurisdiction over the ACFA claim under 28 U.S.C. § 1367 because it arises from the same nucleus of operative facts.

18. The Court has personal jurisdiction over PCH because it operates and maintains its principal place of business in this District.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). PCH is headquartered in this District and the events giving rise to these claims occurred in this District.

## FACTUAL ALLEGATIONS

### Overview of Website Tracking

20. Website tracking technologies typically function by embedding small pieces of code on websites, which are then automatically downloaded from the website onto users' web browsers when they visit the website. This code prompts the collection of detailed data

about the users' interactions with the website, which is then transmitted to third-party servers.

21. The most basic form of website tracking involves "cookies," which are small text files stored on users' devices that identify users and their browsing activity. First-party cookies are those placed by the specific website the user is visiting, while third-party cookies are placed by domains other than the one the user is visiting. These third-party cookies enable the tracking and collection of user activity data across multiple websites and are commonly used for commercial purposes.

22. JavaScript-based trackers present a more sophisticated tracking method. Website owners embed JavaScript code into their website's own source code. When a user visits a webpage containing the JavaScript code, a JavaScript tracker is automatically downloaded onto the user's web browser, where it activates and collects data about user behavior and activity, which is then transmitted back to the tracker provider's servers in real time.

23. The interception and disclosure of users' private, healthcare-related communications through these tracking technologies is particularly problematic, as it can reveal highly personal and sensitive medical conditions, treatment interests, and care-seeking behaviors to third parties without patients' knowledge or consent.

**Google Analytics.**

24. One type of tracking technology available to website owners, like PCH, is Google Analytics.

25. Google LLC ("Google") is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms, generating over $200 billion in annual revenue primarily through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its numerous products and services, including Google Search, Gmail, YouTube, and Android, which it then leverages to deliver targeted advertisements.

26. Google Analytics is an online platform offered by Google that allows website owners to track visitors' actions on their website in order to gain insights into user behavior and to target them with advertisements. PCH uses Google Analytics on its website at www.phoenixchildrens.org.

27. Google markets Google Analytics as a platform that offers "a complete understanding of your customers across devices and platforms" to "give[ ] you the tools, free of charge, to understand the customer journey and improve marketing ROI."[4]

28. Google also markets the real-time reporting capabilities of Google Analytics and boasts that "Realtime reports" allow website hosts to "monitor activity on your website as it happens." According to Google, "with Realtime, you can immediately and continuously monitor the effects that new campaigns and site changes have on your traffic."[5]

29. For Google Analytics to work, website owners or administrators embed a small piece of Google Analytics JavaScript code into each page of their websites that they wish to track.

30. When a user accesses a website equipped with Google Analytics, Google's JavaScript code reads and analyzes the user's communications sent from the user's browser to the host website ***while those communications are in transit to the host website.*** The initial interception and analysis by Google occur in real time while the entire communication from the user is being transmitted and sent to the host website.

31. That simultaneous process enables Google to read and understand the user communications in real-time.

32. The JavaScript code also collects device information related to the specific

---

[4] *See* www.marketingplatform.google.com/about/anaytics.com, last visited on October 6, 2026.

[5] *See Analytics Help*, Google Support, https://support.google.com/analytics/answer/9271392?, last visited on October 6, 2026.

computing device patients are using to access PCH's website. The device information disclosed to Google includes patients' operating system, browser, language, and screen resolution.

33. In addition to the JavaScript code, Google Analytics uses two types of cookies to track user activity.

34. The first type of cookies are geared toward visitors logged into a Google Chrome browser or signed into their Google Account (such as Gmail or YouTube). For these visitors, Google assigns unique identifiers to that session through third-party cookies including 3PSID, 3PAPISID, and 3PSIDCC. These cookies are set by Google services (such as google.com) and are explicitly tied to the specific user's logged-in Google account. The values of these cookies are unique to each account holder and persist across sessions and devices as long as the user remains signed in.

35. When creating a Google account, users are required to provide an email address, meaning that data collected alongside the 3PSID, 3PAPISID, and 3PSIDCC cookies (such as user communications on the PCH website) can be linked by Google to a specific, identifiable email address. Since additional information is collected in creating a Google account, such as name, address, phone number, profile photograph, and recovery email, Google can associate the data collected alongside the cookies not only with an email address, but also with the account holder's name and other identifying information.

36. The second type of cookie applies to users who are not signed into a Google account. This cookie is known as the NID cookie. The NID cookie is tied to the user's browser rather than to a named account. It still contains a unique identifier that persists for approximately six months, unless a user manually "clears" their cookies (after which a new, unique identifier associated with the NID cookie is generated).

37. NID cookies enable Google to track user preferences, browsing behavior, and advertisement interactions across websites that use Google Analytics or serve Google Ads. While the NID cookie does not reveal a named account identity, it still allows Google to

build behavioral profiles and serve personalized advertisements based on a user's activity, including activity on PCH's website.

38. Importantly, Google Analytics runs in the background ("Source Code")[6] without any visible indication to the user, making it completely invisible to ordinary website visitors. In other words, website users typically have no idea that their electronic communications are being transmitted to Google.

39. Google's Privacy Policy expressly acknowledges its practice of tracking users, even when they are not logged in, via sites that have installed Google Analytics. Per Google's own statement: "[w]hen you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This allows us to do things like maintain your preferences across browsing sessions, such as your preferred language or whether to show you more relevant search results or ads based on your activity."[7]

**PCH's Use of Google Analytics on its Website**

40. PCH provides pediatric healthcare throughout Arizona, with several hospitals and outpatient facilities, offering care in more than 75 subspecialty fields of pediatric medicine.[8]

41. PCH operates its website as an extension of its healthcare services, facilitating patient care, payment, and providing healthcare information. Patients communicate with

---

[6] A webpage consists primarily of "Markup" and "Source Code." The markup of a web page is the visible portion of that page. The source code is a set of instructions that commands the browser to take certain actions, either when a web page loads or when a specific event triggers the code. The source code runs in the background and is not visible to an ordinary user.

[7] *See* Google, *Privacy Policy*, https://policies.google.com/privacy/embedded?hl=en-US, last visited on October 6, 2026.

[8] Information from www.phoenixchildrens.org, last visited on October 6, 2026.

PCH by entering search terms, selecting specialties, viewing physician and condition pages, clicking appointment or contact options, interacting with forms, and navigating pages that reveal medical conditions, symptoms, treatments, providers, and care needs.

42. The communications at issue include detailed, personal health information about when and where a patient seeks pediatric care, the type of pediatric provider or specialist sought, the condition or symptom searched, the treatment or service reviewed, and appointment- or billing-related activity.

43. Information concerning a person's physical and mental health is among the most confidential and sensitive information recognized by law.

44. Patients reasonably expect—and the law requires—that their sensitive, healthcare-related communications with their healthcare provider will remain confidential and will not be surreptitiously disclosed to third parties for commercial purposes.

45. Despite its clear duty to keep patient health information confidential, PCH deliberately used Google Analytics to disclose patients' sensitive health information and electronic communications to Google without proper consent.

46. By installing Google Analytics on its website, PCH is essentially handing its patients a tapped device. Once the webpage is loaded on patients' browsers, the software-based wiretap is quietly waiting for private communications on the website to trigger the tap, which intercepts those communications intended only for PCH, and transmits those communications to Google.

47. The information PCH disclosed to Google in violation of HIPAA includes, but is not limited to, Plaintiffs' and Class Members': (i) scheduling of appointments; (ii) doctor searches; (iii) facility location searches; (iv) specialty searches; (v) payment of bills; and (vi) computer device and browser information. When combined with persistent identifiers (the cookies) as discussed above, this information allows Google to identify individual users and associate sensitive health information with their identities.

48. The persistent identifiers (cookies) used by Google Analytics create digital

fingerprints that allow Google to track individuals across multiple devices and browsing sessions, connecting their healthcare inquiries to broader online activities.

49. Upon information and belief, Google combines this intercepted healthcare-related data with information from its other services, creating comprehensive user profiles that include sensitive health information which can be used for targeted advertising and other commercial purposes.

50. Because of the risks involved with receiving intercepted healthcare-related data, Google "makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service."[9]

51. By way of example, PCH's disclosure of Personal Information to Google occurs through the following patient-website interactions.

52. *Schedule an Appointment*: To schedule an appointment on PCH's website, a patient makes a request by completing a submission form. Unbeknownst to the patient, PCH's website automatically collects and transmits to Google the patient's scheduling-related activity, including whether the patient visited the "Schedule an Appointment" page or submitted the appointment scheduling form. This information, alongside the cookies, allows Google to associate medical scheduling with the user's unique digital profile, creating a record of his or her appointment/call back request.

53. While a patient viewing the appointment page sees places to input name and date of birth for scheduling, a view of the source code reveals that those entries were automatically transmitted to Google via Google Analytics alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies.

54. *Search for a Doctor*: A patient can search for a doctor on PCH's website by selecting the "Find a Doctor" tab. Once selected, that patient can search for a doctor by

[9] Information from www.support.google.com/analytics, last visited on October 6, 2026.

name, specialty, and/or location. A list of matching providers is then displayed, and a patient can access individual profile pages by clicking on a doctor's name. Unbeknownst to the patient, PCH's website automatically collects and transmits to Google information including the name of the provider searched for and the filters in coded form. PCH's website also transmits to Google when the patient clicks to view a provider's profile page (including the name of the provider) and when the patient clicks the provider's phone number to initiate a call (including the exact phone number), indicating an intent to connect with that provider for care. All these transmissions occur alongside the cookies, allowing Google to associate search terms and the names, specialties, and locations of doctors with the user's unique digital profile, creating a record of their medical concerns.

55. While a patient viewing the website sees images of the doctors searched with listed specialties and other information, a view of the source code reveals that this search was automatically transmitted to Google via Google Analytics alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies.

56. *Location Search*: A patient can search for PCH facility locations and service types on its website. After narrowing down by their preferred criteria, a patient can click to view more information about a specific facility, click to call the facility, or receive directions (via Google Maps) to said facility. Unbeknownst to the patient, PCH's website automatically collects and transmits that information to Google, including the type of service the user views alongside the cookies, allowing Google to associate locations and specialties with the user's unique digital profile, creating a record of their medical concerns.

57. While a patient viewing the website sees images of the location search results, a view of the source code reveals that this search and results of the search were automatically transmitted to Google via Google Analytics alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies.

58. *Specialties and Conditions*: The website allows patients to search for various medical information, using a free-text search bar, or specific conditions and topics. Once

presented with relevant search results, users can click to view the medical articles. Again, PCH's website automatically collects and transmits that information to Google, including the search results alongside the cookies, allowing Google to associate locations and specialties with the user's unique digital profile, creating a record of their medical concerns.

59. While a patient viewing the website sees images of medical search results, a view of the source code reveals that this search and search results were automatically transmitted to Google via Google Analytics alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies.

60. *Pay a Bill*: Using PCH's website, a patient can select the tab "Pay a Bill" to make a payment and can then click through to the page of PCH's "online bill portal." When a patient clicks to visit these pages, PCH's website automatically collects and transmits to Google that information alongside the cookies, allowing Google to associate a patient's medical payment with the user's unique digital profile, creating a record of their medical concerns.

61. While a patient viewing the website only sees a "Pay a Bill" tab, a view of the source code reveals that patient's visit to this page was automatically transmitted to Google via Google Analytics alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies.

**PCH Fails to Obtain Patient Consent to Share Personal Information with Google**

62. As previously discussed, and further detailed below, PCH, as a medical provider, is not permitted to use tracking technology tools (like Google Analytics) in a way that shares patients' Private Information with any third party without express and informed patient consent.

63. PCH failed to obtain such consent or even notify patients of its data-sharing practices. To the contrary, its Privacy Policy misleadingly states: "At no time is your private information, which is obtained through cookies, shared with third parties who have no right

to that information."[10]

64. While PCH's website does discuss the use of cookies and, as of December 2025, also added a banner asking users to accept the use of cookies, PCH's Privacy Policy, which the banner directs website users to, specifically (and incorrectly) states that the information the cookies collect is anonymous and non-personally identifiable.[11] Nothing in PCH's Privacy Notice alerts users to the fact that PCH uses its website to share Personal Information with Google.

65. Plaintiffs and Class Members did not consent to PCH's disclosure of their sensitive, confidential, and personally identifying health information to Google.

66. Plaintiffs and Class Members had and have a reasonable expectation of privacy in their confidential healthcare information and communications, especially information related to: (i) their medical symptoms, concerns and conditions; (ii) their medical searches; (iii) dates and times of their medical appointments; and (iv) payments for medical services.

**PCH's Exposure of Plaintiffs' Private Information Violates HIPAA**

67. Patient health care information in the United States is protected by federal law under HIPAA and its implementing regulations, which are promulgated by HHS.

68. HIPAA "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[12]

---

[10] http://www.phoenixchildrens.org/our-policies (last visited October 6, 2026).

[11] *See Id.*

[12] HHS.gov, *Health Information Privacy* (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

69. HIPAA broadly defines “protected health information” (“PHI”) as “individually identifiable health information” (“IIHI”) that is “transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium.” 45 C.F.R § 160.103.

70. IIHI is defined as “a subset of health information, including demographic information collected from an individual” that is: (1) “created or received by a health care provider, health plan, employer, or health care clearinghouse”; (2) “[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual”; and (3) either (a) “identifies the individual” or (b) “[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual.” 45 C.F.R § 160.103.

71. Under the HIPAA de-identification rule, “health information is not individually identifiable only if”: (1) an expert “determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information” and “documents the methods and results of the analysis that justify such determination”’; or (2) “the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

A. Names;

***

H. Medical record numbers;

***

J. Account numbers;

***

M. Device identifiers and serial numbers;

***

N. Web Universal Resource Locators (URLs);

***

O. Internet Protocol (IP) address numbers; and

***

P. Any other unique identifying number, characteristic, or code. and" the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514.

72. HIPAA requires any "covered entity"—which includes health care providers like PCH—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

73. These protections are expansive. Even the fact that an individual is receiving a medical service, *i.e.,* is a patient of a particular entity, can be Protected Health Information. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source (such as a phonebook) because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[13]

74. Consistent with these protections, HIPAA precludes the disclosure of non-public medical information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization 45 C.F.R.

---

[13] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule,* HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html.

§§ 164.502; 164.508(a)(3), 164.514(b)(2)(i); 67 Fed. Reg. 53186 (Aug. 14, 2002).

75. HIPAA also requires a covered entity to "Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits." 45 C. F. R. § 164.306(a)(1).

76. The reason for these HIPAA protections is straightforward. As discussed by the OCR in its June 26, 2024 Bulletin:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.[14]

77. OCR's Bulletin also "highlight[ed] the obligations" of health care providers under HIPAA "when using online tracking technologies" (such as those used by PCH) that "collect and analyze information about how internet users interact with regulated FHIPAA

---

[14]OCR Bulletin, June 26, 2024, at https://www.hhs.gov/hipaa/for-professionals/ privacy/ guidance/hipaa-online-tracking/index. Html (emphasis in original).

when they use tracking technologies that disclose an individual's identifiable information even if no treatment information is included and even if the individual does not have a relationship with the health care provider.[15]

78. A hospital, such as PCH, runs afoul of HIPAA where it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; (2) obtains individually identifiable health information relating to an individual; or (3) discloses individually identifiable health information to another person." 42 U.S.C. § 1320d-6. Section 1320d-6 further provides that "a person (including an employee or other individual) shall be considered to have obtained or disclosed individually identifiable health information in violation of this part if the information is maintained by a covered entity (as defined in the HIPAA privacy regulation described in section 1320d-9(b)(3) of this title) and the individual obtained or disclosed such information without authorization." *Id.*

79. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." *Id.* In such cases, the offender shall "be fined not more than $250,000, imprisoned not more than 10 years, or both." *Id.*

80. Here, PCH violated HIPAA by electing to install Google Analytics on its website, thereby disclosing Plaintiffs' and all other website users' Personal Information to Google without permission.

81. PCH further failed to comply with HIPAA's safeguards by: (i) failing to ensure the confidentiality and integrity of electronic PHI that PCH created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1); (ii) failing to implement policies and procedures to prevent, detect, contain, and correct security violations

---

[15] *Id.*

in violation of 45 C.F.R. § 164.308(a)(1); and (iii) failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3).

**PCH Disclosed Patients' HIPAA-Protected Information for Commercial Gain**

82. As stated, Google Analytics allows website owners to track visitors' actions on their website in order to gain insights into user behavior and to target them with personal advertisements for commercial gain. On information and belief, PCH implemented Google Analytics for those very reasons.

83. After receiving Private Information communicated on PCH's website through the Google Analytics tools, Google forwards this data, and its analysis of this data, back to PCH.

84. PCH then uses this data and analysis to advance its own commercial purposes which include understanding how to better attract existing and prospective patients.

85. Thus, in exchange for disclosing the Personal Information of its patients, PCH received insight into marketing strategy.

86. This benefit comes at the direct cost of Plaintiffs' and Class Members' rights under HIPAA and expectations of privacy promised to them by PCH.

**Plaintiff Sarah Gray's Experiences**

87. Gray brought her minor son to PCH's emergency room on two occasions between six and twelve years ago.

88. More recently, Gray brought her son to see a cardiology specialist on or about June 26, 2025.

89. Gray searched PCH's website for information regarding cardiology specialists and doctors in that field prior to the appointment. Gray also signed into PCH's portal to view her son's medical files and used PCH's website to schedule appointments, make payments, search locations, and submit medical forms. The last time Gray visited PCH's website was

on or about March 13, 2026.

90. Gray has a Google account, Gmail, a Youtube account, and uses an Android cellular telephone. Gray used Google Chrome to access PCH's website and was signed into her Google account when visiting PCH's website.

91. As a condition of receiving PCH's services, Gray disclosed her son's Private Information to PCH during her communications with PCH on the website; but for her son being a patient of PCH, Gray would not have disclosed his Private Information to PCH.

92. Gray reasonably expected that her communications with PCH via the Website would be kept confidential, solely between herself and PCH and that such communications would not be transmitted to or intercepted by a third party. Gray had no idea and no reasonable way of knowing that Personal Information was being disclosed to third parties.

93. However, and as a result of PCH installing Google Analytics on its website, the Private Information provided by Gray was disclosed to Google. In sum, Gray's Google-related accounts, Android phone, and use of Google Chrome enable Google to connect the private medical information sent by PCH to her.

94. The information disclosed to Google included Gray's (i) scheduling of appointments; (ii) doctor searches; (iii) facility location searches; (iv) specialty searches; and (v) payment of bills. Google also receives information regarding Gray through the cookies embedded with Google Analytics.

95. After Gray's Personal Information was disclosed to Google, Gray began receiving spam emails in her Gmail and other advertisements on her browser related to the medical searches she conducted on PCH's website.

96. Gray provided Private Information to PCH and trusted that the information would be safeguarded in accordance with PCH's policies and state and federal law.

97. Gray reasonably expected that her communications with PCH via its website would be kept confidential, solely between herself and PCH, and that such communications would not be transmitted to or intercepted by a third party. Indeed, PCH's own privacy

policy specifically states that "At no time is your private information … shared with third parties who have no right to that information."

98. Gray never consented to any third party's receipt or use of her Private Information.

99. Had she known that the Private Information she submitted would be shared with third parties, Gray would not have used PCH's website in the same manner, would have taken steps to avoid disclosure, would have paid less for services, would have sought information or services through other means, or simply would have chosen a different healthcare facility.

100. Nevertheless, PCH, through its decision to utilize Google Analytics for its website, disclosed the Private Information provided by Gray to Google.

101. By disclosing Gray's Private Information to Google without authorization, PCH violated Gray's privacy rights and her rights under HIPAA.

102. Gray has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in PCH's possession, is protected and safeguarded from future unauthorized disclosure(s).

**Plaintiff Jennifer Dufault's Experiences**

103. Dufault has brought her son to various PCH facilities numerous times throughout his life, the most recent being on or about September 18, 2026.

104. In connection with her son's medical visits, Dufault used PCH's website to search for doctors and specialties, schedule appointments, submit medical forms, and search for PCH locations. Almost all of these searches and interactions with PCH's website were conducted with Dufault's Android cellular telephone using Google's Chrome web browser. The last time Dufault visited PCH's website was on or about September 18, 2026.

105. Dufault has a Google account, which she was signed into when interacting with PCH's website, and a Gmail account.

106. As a condition of receiving PCH's services, Dufault disclosed her son's

Private Information to PCH during her communications with PCH on the website; but for her son being a patient of PCH, Dufault would not have disclosed his Private Information to PCH.

107. Dufault reasonably expected that her communications with PCH via the Website would be kept confidential, solely between herself and PCH and that such communications would not be transmitted to or intercepted by a third party. Dufault had no idea and no reasonable way of knowing that Personal Information was being disclosed to third parties.

108. However, and as a result of PCH installing Google Analytics on its website, the Private Information provided by Dufault was disclosed to Google. In sum, Dufault's Google-related accounts, Android phone, and use of Google Chrome enable Google to connect the private medical information sent by PCH to her.

109. The information disclosed to Google included Dufault's (i) scheduling of appointments; (ii) doctor searches; (iii) facility location searches; (iv) specialty searches; and (v) payment of bills. Google also receives information regarding Dufault through the cookies embedded with Google Analytics.

110. Dufault provided this Private Information to PCH and trusted that the information would be safeguarded in accordance with PCH's policies and state and federal law.

111. Dufault reasonably expected that her communications with PCH via its website would be kept confidential, solely between herself and PCH, and that such communications would not be transmitted to or intercepted by a third party. Indeed, PCH's own privacy policy specifically states that "At no time is your private information … shared with third parties who have no right to that information."

112. Dufault never consented to any third party's receipt or use of her Private Information.

113. Had she known that the Private Information she submitted would be shared

with third parties, Dufault would not have used PCH's website in the same manner, would have taken steps to avoid disclosure, would have paid less for services, would have sought information or services through other means, or simply would have chosen a different healthcare facility.

114. Nevertheless, PCH, through its decision to utilize Google Analytics for its website, disclosed the Private Information provided by Dufault to Google.

115. By disclosing Dufault's Private Information to Google without authorization, PCH violated Dufault's privacy rights and her rights under HIPAA.

116. Dufault has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in PCH's possession, is protected and safeguarded from future unauthorized disclosure(s).

## CLASS ALLEGATIONS

117. Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals (the "Class" or "Class Members"), defined as follows:

> All patients of PCH whose individually identifiable health information was disclosed to a third party without authorization or consent.

118. Excluded from the Class are PCH, its agents, affiliates, parents, subsidiaries, any entity in which PCH has a controlling interest, any PCH officer or director, any successor or assign and any Judge who adjudicates this case, including the Judge's staff and immediate family.

119. Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the action.

120. ***Ascertainability and Notice.*** Membership in the Class can be determined by objective records maintained by PCH and adequate notice can be given to Class Members

directly using information maintained in PCH's records.

121. ***Numerosity*** **(Fed. R. Civ. P. 23(a)(1)).** Members of the Class are so numerous that joinder of all Class Members is impractical. Based on the size of PCH, the number of patients using its services and website is estimated to be in the thousands, rendering joinder impractical.

122. ***Commonality*** **(Fed. R. Civ. P. 23(a)(2))**. A well-defined community of interest exists in the questions of law and fact involved in this action. Questions of law and fact common to the members of the Class that predominate over questions affecting only individual Class Members include, but are not limited to, the following:

(a) Whether PCH had a duty to protect and refrain from disclosing Class Members' individually identifiable health information;

(b) Whether PCH intentionally disclosed Class Members' individually identifiable health information to Google;

(c) Whether Class Members consented to PCH's disclosure of their individually identifiable health information to Google;

(d) Whether the Class Members are entitled to damages because of PCH's conduct;

(e) Whether PCH's knowing disclosure of its patients' individually identifiable health information to Google is "criminal or tortious" under 18 U.S.C. § 2511(2)(d);

(f) Whether PCH's failure to inform its patients the extent of disclosure to Google is material under A.R.S. § 44-1522;

(g) Whether PCH intended that patients rely on its omissions; and

(h) Whether Plaintiff and Class Members are entitled to statutory damages, actual damages, restitution, disgorgement, injunctive relief, and other relief.

123. ***Typicality*** **(Fed. R. Civ. P. 23(a)(3)).** Plaintiffs' claims are typical of the claims belonging to Class Members. Plaintiffs and Class Members were harmed by the same wrongful conduct perpetrated by PCH that caused their individually identifiable health

information to be intercepted and disclosed without notice or consent. As a result, Plaintiffs' claims are based on the same facts and legal theories as Class Members' claims.

124. ***Adequacy* (Fed. R. Civ. P. 23(a)(4)).** Plaintiffs will adequately safeguard the interests of Class Members, as Plaintiffs' interests align with, and do not conflict with those of the Class. Plaintiffs' counsel has experience in handling class action litigation, including consumer privacy and statutory violations related thereto. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

125. ***Injunctive and/or Declaratory Relief* (Fed. R. Civ. P. 23(b)(2)).** As demonstrated above, unless a Class-wide injunction is issued, PCH will continue to fail to properly secure the Private Information of Class Members, PCH will continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and PCH will continue to act unlawfully as set forth in this Complaint as PCH has acted or refused to act on grounds generally applicable to the Class. Accordingly, final injunctive or corresponding declaratory relief with regard to the Class as a whole is appropriate.

126. ***Predominance and Superiority*** (**Fed. R. Civ. P. 23(b)(3)).** Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other methods for the fair and efficient adjudication of the controversy because:

(a) Proof of PCH's liability on Plaintiffs' claim will also prove liability for the claims of the Class without the need for individualized proceedings;

(b) Evidence regarding defenses or any exceptions to liability that PCH may assert and attempt to prove will come from PCH's records and will not require individualized or separate inquiries or proceedings;

(c) PCH has acted and is continuing to act pursuant to common policies or practices in the same or similar manner with respect to all Class Members;

(d) The injury suffered by each Class Member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against PCH

economically feasible. Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system. A class action, on the other hand, will permit a large number of claims involving virtually identical facts and legal issues to be resolved efficiently in one proceeding based upon common proofs without the risk of inconsistent judgments; and

(e) This case is inherently manageable as a class action in that: (i) PCH's records will enable Plaintiffs to readily identify Class Members and establish liability and damages; (ii) liability and damages can be established for Plaintiffs and the Class with the same common proofs; (iii) a class action will result in an orderly and expeditious administration of claims, fostering economies of time, effort, and expense; (iv) a class action will contribute to uniformity of decisions concerning PCH's practices; and (v) as a practical matter, the claims of each Class Member are likely to go unaddressed absent class certification.

## **COUNT I**

### **Violation of the Electronic Communications Privacy Act, 18 U. S. C. § 2511.**

127. Plaintiffs incorporate the allegations contained in the foregoing paragraphs as if fully set forth herein.

128. The ECPA makes it unlawful to "intentionally intercept[ ], endeavor[ ] to intercept, or procure[ ] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" and provides a private right of action to any person whose wire or electronic communications are intercepted. 18 U.S.C. § 2511(1)(a); 18 U. S. C. § 2520(a).

129. To state a claim, a plaintiff must demonstrate that the defendant "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device." *See Stein v. Edward-Elmhurst Health*, 2025 WL 580556, *3 (N.D. Ill. Feb. 21, 2025) (citation omitted).

130. The word "intercept" sweeps broadly, covering "the aural or other acquisition

of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *See* 18 U.S.C. § 2510(4).

131. When used with respect to any wire, oral, or electronic communication, the word "contents" means "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

132. "Electronic communications" encompasses "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

133. "Electronic, mechanical, or other device" is defined as "any device ... which can be used to intercept a[n] ... electronic communication[.]"18 U.S.C. § 2510(5).

134. While a party is allowed to intercept its own communications under the ECPA, that is not the case where the interception is "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). If a party to the communication intercepts the communication for the purpose of committing an act that is a crime or a tort, it is in violation of the ECPA. *Id.*

135. Here, as discussed above, PCH intentionally installed Google Analytics on its website to monitor and analyze website traffic and communication.

136. With Google Analytics, PCH intercepted Plaintiffs' and other Class Members' website activities, which constitute electronic communications as defined by ECPA. The contents of these communications all relate to Plaintiffs' and Class Members' private medical information, including doctor and medical specialty searches, the scheduling of appointments, location searches, and payment.

137. To intercept these communications, PCH used the following devices: Google Analytics and associated cookies, its website and servers, and Plaintiffs' and Class Members' internet browsers and computer devices.

138. Although PCH was a party to the communications with Plaintiffs and Class

Members, it intercepted their electronic communications in real time for the purpose of committing tortious or criminal acts in violation of the law. Specifically, PCH intercepted the contents of its patients' communications in real time for the purpose of disclosing those communications to Google in violation of section 1320d-6 of HIPAA, which provides criminal penalties against a healthcare provider for "knowingly … disclos[ing] individually identifying health information to another person" without authorization. 42 U.S.C. § 1320d-6.

139. In sum, PCH violated the ECPA by (i) intentionally installing Google Analytics on its website, which (ii) intercepted (iii) the contents of Plaintiffs' private medical information that were (iv) shared electronically with PCH on its website (v) through the use of Google analytics, its website, and Plaintiffs' own internet browsers (vi) for the purpose of committing a tortious or criminal act.

140. Thus, on behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class; (iii) damages in accordance with 18 U. S. C. § 2520; and (iv) reasonable attorneys' fees and other litigation costs.

## COUNT II

### Violation of the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*

141. Plaintiffs incorporate the allegations contained in the foregoing paragraphs as if fully set forth herein.

142. The Arizona Consumer Fraud Act ("ACFA"), A.R.S. 44-1521 *et seq.*, prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of Arizona.

143. A.R.S. § 44-1522 provides in pertinent part:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any

> material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

144. To state a claim under ACFA, a plaintiff must allege that (i) the defendant made a misrepresentation in connection with the sale or advertisement of consumer goods and services and (ii) defendant's conduct proximately caused plaintiff to suffer damages.

145. Here, PCH advertised, offered, and sold healthcare services and related merchandise within the meaning of ACFA. *See* A.R.S. §§ 44-1521 and 44-1522.

146. In advertising, offering, and/or selling its healthcare services, PCH engaged in deception, deceptive or unfair acts or practices, concealment, suppression, and omission of material facts.

147. Specifically, PCH asserted in its Privacy Policy that no patient information is shared with third parties, which is false.

148. PCH omitted and concealed that it implemented Google Analytics on its website, which shares Plaintiffs' and other Class Members' Private Information with Google.

149. PCH's omission was material because reasonable consumers would consider it important that a children's hospital was transmitting health-related communications and identifiers to Google for analytics, advertising, marketing, retargeting, or commercial purposes.

150. PCH intended that Plaintiffs and Class Members rely on this omission by using its website to seek healthcare information and services without knowing that their sensitive communications would be disclosed to Google.

151. PCH's conduct occurred in connection with the sale or advertisement of merchandise because PCH used its website to market, advertise, facilitate, and provide healthcare services, appointments, providers, specialties, programs, locations, and related

services.

152. Plaintiffs and Class Members relied on PCH's omissions and privacy representations by using the website and communicating health-related information to PCH without knowledge of the undisclosed Google tracking and disclosure practices.

153. Had Plaintiffs and Class Members known the truth, they would not have used PCH's website in the same manner, would have taken steps to avoid disclosure, would have paid less for services, would have sought information or services through other means, or simply would have chosen a different healthcare facility.

154. Plaintiffs and Class Members suffered ascertainable loss and injury, including loss of privacy, loss of confidentiality, loss of control over sensitive information, disclosure of health-related communications to Google, overpayment or payment for services different from those represented, diminished value of the services received, and loss of the ability to make an informed decision as to which healthcare facility to use.

155. Plaintiffs and Class Members seek actual damages, restitution, disgorgement, injunctive relief, reasonable attorneys' fees and costs where available, and all other relief permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that this Court grant judgment against Phoenix Children's Hospital as follows:

(a) An order certifying the Class, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b) Declaring that PCH's conduct violated the Electronic Communications Privacy Act and the Arizona Consumer Fraud Act;

(c) Awarding statutory damages under 18 U.S.C. § 2520;

(d) Awarding actual damages, restitution, and disgorgement;

(e) Awarding punitive damages where permitted by law;

(f) Enjoining PCH from intercepting, disclosing, or using Plaintiffs' and Class Members' health-related website communications through Google Analytics or other related tracking technologies without valid consent;

(g) Requiring PCH to delete, retrieve, or request deletion of unlawfully disclosed information to the extent feasible;

(h) Awarding pre-judgment and post-judgment interest;

(i) Awarding reasonable attorneys' fees, costs, and expenses; and

(j) Awarding such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Dated: October 13, 2026,

By: /s/ L Bivens

Lisa Bivens (Az Bar No 034075)

**DON BIVENS PLLC**
Lisa Bivens (Az Bar No 034075)
Don Bivens (AZ Bar No. 005134)
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone: (602) 762-2661
don@donbivens.com
lisa@donbivens.com

*Counsel for Plaintiffs and the Proposed Class*